1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SEATTLE, a bank created by federal law,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CREDIT SUISSE SECURITIES (USA) LLC f/k/a CREDIT SUISSE FIRST BOSTON LLC, a Delaware limited liability company; CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., a Delaware corporation; and CREDIT SUISSE MANAGEMENT LLC f/k/a CREDIT SUISSE FIRST BOSTON MANAGEMENT LLC, a Delaware limited liability company,<br><br>                    Defendants. | NO.<br><br><br>**NOTICE OF REMOVAL** |

Defendants Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Mortgage

Securities Corp. and Credit Suisse Management LLC (collectively, "Defendants"), as and for

their Notice of Removal of this action from the Superior Court of Washington, King County,

state as follows:

    1.      This Notice of Removal is filed pursuant to 28 U.S.C. § 1441, *et seq.*

*Notice of Removal - Page 1*

2.      On December 29, 2009, Defendants were served with a copy of the Summons and Complaint in this case, filed in the Superior Court of Washington, King County.  A true and correct copy of the Summons and Complaint is attached as Exhibit A.

3.      On December 29, 2009, Defendants were served with a copy of the Order Setting Civil Case Schedule and Case Information Cover Sheet and Area Designation.  True and correct copies of the Order Setting Civil Case Schedule and Case Information Cover Sheet and Area Designation are attached as Exhibit B.

4.      True and Correct copies of the Affidavits of Service of the Summons and Complaint, Order Setting Civil Case Schedule and Case Information Cover Sheet and Area Designation are attached as Exhibit C.

5.      No other process, pleadings or papers have been received or filed by Defendants, and there have been no further proceedings in the Superior Court of Washington, King County, as of the date of this Notice of Removal.

6.      Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is being filed within thirty days of first receipt by Defendants, through service or otherwise, of a copy of the initial pleading setting forth the claims for relief upon which the state court proceeding is based.

7.      Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is being filed less than one year after suit was commenced in the state court.  This Notice of Removal is timely filed in accordance with 28 U.S.C. § 1446.

8.      Pursuant to 28 U.S.C. § 1441(a), the United States District Court for the Western District of Washington is the federal district court for the district and division embracing the place where the state court suit is pending.

*Notice of Removal - Page 2*

9.      This Court has original jurisdiction over this action because:  (1) the action was brought by a federal home loan bank, the Federal Home Loan Bank of Seattle ("Seattle FHLB"); and (2) the "sue and be sued" provision of 12 U.S.C. § 1432(a) expressly authorizes all such banks to file suit in federal court.  *See Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 255 (1992) (holding that a "'sue and be sued' provision may be read to confer federal court jurisdiction" where, as here, "it specifically mentions the federal courts"); *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Raines*, 534 F.3d 779, 784-85 (D.C. Cir. 2008) (considering a "sue and be sued" provision with language substantively identical to that in 12 U.S.C. § 1432(a), and concluding that the provision confers federal court jurisdiction). Accordingly, this action is properly removable pursuant to 28 U.S.C. § 1441.  *See Ewing v. Fed. Home Loan Bank of Des Moines*, 645 F. Supp. 2d 707, 709 & n.4 (S.D. Iowa 2009).

10.      This Court also has original jurisdiction over this action because Seattle FHLB is an agency of the United States with express congressional authority to sue.  *See* 28 U.S.C. § 1345 (providing that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress"); 12 U.S.C. § 1432(a) (authorizing the federal home loan banks to sue); *Rust v. Johnson*, 597 F.2d 174, 178 (9th Cir. 1979) ("A survey of the cases involving the Federal land banks and the Federal home loan banks reveals that they are treated as federal instrumentalities engaged in the performance of governmental functions even though their stock may be privately owned."); *Fahey v. O'Melveny & Myers*, 200 F.2d 420, 446-47 (9th Cir. 1952) ("We hold that all Federal Home Loan Banks within the System are, and operate as, public agencies and instrumentalities of the federal government . . . .").  Accordingly, and for this additional reason, this action is

*Notice of Removal - Page 3*

1
2
3

properly removable pursuant to 28 U.S.C. § 1441.  *See Fed. Home Loan Bank of San Francisco v. Long Beach Fed. Sav. & Loan Ass'n Title Serv. Co.*, 122 F. Supp. 401, 462 (9th Cir. 1954).

4
5
6
7
8
9
10
11
12
13
14
15
16
17

      11.     Finally, this Court has original jurisdiction over this action because the Complaint involves a claim between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  *See* 28 U.S.C. § 1332.  Seattle FHLB is a federally chartered corporation, which, on information and belief, was established in, is localized in and has its principal place of business in the State of Washington.  As such, Seattle FHLB is a citizen of Washington for diversity purposes.  Defendants are incorporated in Delaware (Compl. ¶¶3-5), and have their principal places of business in New York.  No Defendant is a citizen of Washington for diversity purposes.  Moreover, in this action, Seattle FHLB seeks rescission of $248,684,515 that it purportedly paid to Defendants in connection with three transactions.  (*See id.* at ¶1.)  Accordingly, and for this additional, independent reason, this action is properly removable pursuant to 28 U.S.C. § 1441.

18
19

      12.     Pursuant to 28 U.S.C. § 1446(d), all adverse parties are being provided with written notice of the filing of this Notice of Removal.

20
21
22

      13.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the Clerk of the Superior Court of Washington, King County.

23
24
25
26
27
28

//

//

//

*Notice of Removal - Page 4*

HILLIS CLARK MARTIN &
PETERSON, P.S.
1221 Second Avenue, Suite 500
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

WHEREFORE, Defendants remove the above-captioned case from the Superior Court of Washington, King County, to this Court.

DATED this 27th day of January, 2010.

HILLIS CLARK MARTIN & PETERSON, P.S.

By   <u>s/ Michael R. Scott</u>
      Michael R. Scott, WSBA #12822
      Michael J. Ewart, WSBA #38655
      1221 Second Avenue, Suite 500
      Seattle WA 98101-2925
      Telephone:  (206) 623-1745
      Facsimile:  (206) 623-7789
      Email:  mrs@hcmp.com;
      mec@hcmp.com; bcf@hcmp.com

OF COUNSEL
CRAVATH, SWAINE & MOORE LLP
      Richard W. Clary
      Cravath, Swaine & Moore LLP
      Worldwide Plaza
      825 Eighth Avenue
      New York, NY 10019
      Telephone:  (212) 474-1000
      Facsimile:  (212) 474-3700
      Email: rclary@cravath.com

Attorneys for Defendants
Credit Suisse Securities (USA) LLC, f/k/a
Credit Suisse First Boston LLC; Credit Suisse
First Boston Mortgage Securities Corp.; and
Credit Suisse Management LLC, f/k/a Credit
Suisse First Boston Management LLC

ND:  19975.002 4821-3259-5717v1   1/27/10

HILLIS CLARK MARTIN &
PETERSON, P.S.
1221 Second Avenue, Suite 500
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

# EXHIBIT A

FILED

09 DEC 23 PM 2:53

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46353-1 SEA

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SEATTLE, a bank created by federal law, | No. |
| Plaintiff, | COMPLAINT FOR RESCISSION |
| v. | |
| CREDIT SUISSE SECURITIES (USA) LLC f/k/a CREDIT SUISSE FIRST BOSTON LLC, a Delaware limited liability company; CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., a Delaware corporation; and CREDIT SUISSE MANAGEMENT LLC f/k/a CREDIT SUISSE FIRST BOSTON MANAGEMENT LLC, a Delaware limited liability company, | |
| DefendantS. | |

## I. SUMMARY OF THIS COMPLAINT

1.      This is an action under the Securities Act of Washington, RCW 21.20.005 *et seq.*, to rescind the purchase and sale of four certificates in three securitizations backed by residential mortgage loans, which the defendants sold the plaintiff for $45,000,000, $100,000,000, $33,384,515, and $70,300,000, respectively. When they offered and then sold these certificates to the plaintiff, the defendants made numerous statements to the

COMPLAINT FOR RESCISSION – Page 1

YARMUTH WILSON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

plaintiff about the certificates and the credit quality of the mortgage loans that backed them. Many of those statements were untrue. Moreover, the defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the defendants made untrue statements, or omitted important information, about such material facts as the percentage of equity that borrowers had in their homes (reflected in the loan-to-value ratio, or the ratio of the amount of the mortgage loan to the value of the house that secured the loan), the number of borrowers who actually lived in the houses that secured their loans, the credit scores of the borrowers, and the business practices of the lenders that made the loans. Plaintiff reasonably relied on these untrue statements and omissions of important information in deciding to purchase the certificates. Under the Act, plaintiff therefore is entitled to rescind its purchase of these certificates, and the defendants are required to repurchase the certificates from the plaintiff for their original purchase prices, plus interest at 8% per annum, plus the costs and legal fees that plaintiff will incur in this action, minus distributions that plaintiff has received on the certificates.

## II. PARTIES

2.      The plaintiff, Federal Home Loan Bank of Seattle (referred to in this complaint as Seattle Bank), is a bank created by the Federal Home Loan Bank Act. Under its Organization Certificate, Seattle Bank is to operate in Federal Home Loan Bank District Number 12, which comprises the States of Alaska, Hawaii, Idaho, Montana, Oregon, Utah, Washington, and Wyoming, as well as certain territories of the United States. Seattle Bank does operate throughout those States and territories.

COMPLAINT FOR RESCISSION – Page 2

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

3.      Defendant Credit Suisse Securities (USA) LLC (referred to as Credit Suisse Securities) is a limited liability company organized under the laws of Delaware. Defendant Credit Suisse Securities (USA) LLC was formerly known as Credit Suisse First Boston LLC.

4.      Defendant Credit Suisse First Boston Mortgage Securities Corp. (referred to as CSFB Mortgage Securities) is a corporation organized under the laws of Delaware.

5.      Defendant Credit Suisse Management LLC is a limited liability company organized under the laws of Delaware. Credit Suisse Management LLC was formerly known as Credit Suisse First Boston Management LLC.

6.      On information and belief, Credit Suisse Management LLC participated in the operations of CSFB Mortgage Securities and had the power to control the conduct of CSFB Mortgage Securities in the transactions involved in this complaint. Under RCW 21.20.430(3), Credit Suisse Management LLC directly or indirectly controlled CSFB Mortgage Securities and is therefore liable to Seattle Bank jointly and severally with and to the same extent as CSFB Mortgage Securities.

### III. JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under RCW 2.08.010.

8.      This Court has personal jurisdiction over each of the defendants because each of them offered and sold the securities referred to in this complaint to Seattle Bank in King County.

9.      Venue is proper in this Court pursuant to RCW 4.12.025 because one or more defendants transacts business in King County.

COMPLAINT FOR RESCISSION – Page 3

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

## IV. SECURITIZATION OF MORTGAGE LOANS

10.     The securities that the defendants sold Seattle Bank are so-called **asset-backed securities**, or **ABS**, created in a process known as **securitization**. Securitization begins with loans (for example, loans secured by mortgages on residential properties, credit card loans, etc.) on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. In the loan underwriting process, the originator applies various criteria to try to ensure that the loan will be repaid. Until the loans are securitized, the borrowers on the loans make their loan payments to the originator. Collectively, the payments on the loans are known as the **cash flow** from the loans.

11.     In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors such as Seattle Bank. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

12.     Thus, schematically, there are six steps in a securitization.

    1.      Investors pay money to the trust.

    2.      The trust issues certificates to the investors.

    3.      The trust pays money to the originator.

    4.      The originator sells to the trust the loans in the collateral pool, including the right to receive the cash flow from those loans.

    5.      The trust collects cash flow from payments on the loans in the collateral pool.

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

6.    The trust pays each certificateholder its agreed part of the cash flow that the trust receives from payments on loans in the collateral pool.

*

13.    A few other aspects of securitization may be useful in reading the allegations of this complaint. Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The entity that transfers the loans in the collateral pool to the trust is known as the **depositor**.

14.    The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has no assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore considers the **issuer** of an asset-backed certificate to be not the trust that is the obligor on the certificate, but rather the depositor.

15.    Finally, certificates issued in securitizations are purchased from the trust and sold to investors by firms acting as **securities underwriters**.

*

16.    When a traditional company issues common shares, bonds, or other securities, it and its underwriters must disclose material information about the business and management of the company to potential investors in those securities. In a securitization trust, however, there is no business or management to describe. Rather, the necessary

COMPLAINT FOR RESCISSION – Page 5

**YARMUTH  WILSDON  CALFO**

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

disclosures are about the structure of the transaction and especially about the credit quality

of the loans in the collateral pool, the sole source of cash from which to pay the

certificateholders.

<div align="center">*</div>

17.     Defendants sold to Seattle Bank four certificates in three securitizations.

<div align="center">**V. FIRST CLAIM FOR RELIEF**</div>

|  |  |
|---:|:---|
| *Certificate*: | One certificate in tranche 2-A-1 of Adjustable Rate Mortgage Trust, Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2007-2 |
| *Date of Purchase*: | May 30, 2007 |
| *Consideration Paid*: | $45,000,000 |
| *Underwriter*: | Credit Suisse Securities |
| *Depositor/Issuer*: | CSFB Mortgage Securities |
| *Controlling Person of Depositor/Issuer*: | Credit Suisse Management LLC |

18.     Seattle Bank repeats paragraphs 1 through 17.

19.     Adjustable Rate Mortgage Trust, Adjustable Rate Mortgage-Backed Pass-

Through Certificates, Series 2007-2 was a securitization in May 2007 of approximately

1,792 mortgage loans, in two groups, with an aggregate principal balance of approximately

$663,690,280. The loans were originated by IndyMac Bank, F.S.B, DLJ Mortgage Capital,

Inc. Credit Suisse Financial Corp. and Countrywide Home Loans, Inc. DLJ Mortgage

Capital, Inc. originated or acquired 42.88% of the mortgage loans in Group 2 (from which

Seattle Bank's certificate was to be paid), Credit Suisse Financial Corp. originated or

acquired 21.62%, and Countrywide Home Loans, Inc. originated or acquired 15.86%. The

COMPLAINT FOR RESCISSION – Page 6

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.[1]

20.     Credit Suisse Securities and CSFB Mortgage Securities offered and sold to Seattle Bank a senior certificate in this securitization, in tranche 2-A-1, for which Seattle Bank paid $45,000,000 on May 30, 2007.

21.     In connection with their offer and sale of this certificate to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[2] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Credit Suisse Securities and CSFB Mortgage Securities made statements of material fact about the certificate that they offered and sold to Seattle Bank.

22.     Seattle Bank relied on the statements by Credit Suisse Securities and CSFB Mortgage Securities in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

23.     Many of the statements of material fact that Credit Suisse Securities and CSFB Mortgage Securities made in these documents were untrue or misleading. These untrue or misleading statements included the following.

---

[1] Nonconforming loans include both "alt-A" and "subprime" loans, but there are no precise definitions of those terms.

[2] The prospectus supplement for ARMT 2007-2 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1396007/000089109207002293/e27476.txt.

COMPLAINT FOR RESCISSION – Page 7

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**A.     Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.     The materiality of LTVs**

24.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the value of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most important measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are likewise one of the most important measures of the risk of certificates sold in that securitization. LTV predicts the likelihood of default (the lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity, and thereby give the owner an incentive to stop making mortgage payments and abandon the property). LTV also predicts the severity of loss in the event of default (the lower the LTV, the greater the "cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan).

25.     The denominator in LTV (value of the mortgaged property) is determined by either an appraisal or by the purchase price of the property. In a refinancing or home-equity loan, there is no purchase price to use as the denominator. For a purchase, the agreed price may be higher than the value of the property, and an appraisal should ensure that the LTV is calculated using the actual value as the denominator. Sometimes in a purchase, the denominator is the lower of the purchase price or the appraised value.

26.     Thus, an accurate appraisal is essential to an accurate LTV. In particular, a too-high appraisal will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is appraised instead at

COMPLAINT FOR RESCISSION – Page 8

$550,000, then the LTV of the $300,000 loan falls from 60% to 54.5%, and the LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraisal understates the risk of the loan. It is also important to note that, the higher the correct LTV, the more the risk is understated by an incorrect appraisal of any given magnitude. In the example above, there is little difference in the risk of a loan with an LTV of 60% and one with an LTV of 54.5%; both are safe loans with large equity cushions. But there is a very large difference in the risk of a loan with an LTV of 90% and one with an LTV of 81.8%. In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former, only 10%, just over half as much. Thus, an appraisal that overvalues a property by just 10% produces an overstatement of more than 80% in the homeowner's equity.

27.     LTV is an important measure of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. LTV helps to predict both the likelihood of default and the severity of loss in case of default. A reasonable investor considers LTV important to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTV of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

COMPLAINT FOR RESCISSION – Page 9

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1

2

**2.**   **Untrue or misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the LTVs of the mortgage loans in the collateral pool of this securitization**

3

4

5

28.    In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

6

7

8

9

a.    The weighted average original LTV for the subset of mortgage loans in group 2 (from which Seattle Bank's certificate was to be paid) was 78.95%. ARMT 2007-2 Pros. Sup. S-15.

10

11

b.    "All of the mortgage loans as of the Cut-off Date had LTV ratios at origination of 100% or less." ARMT 2007-2 Pros. Sup. S-29.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

c.    In Annex III of the prospectus supplement ("Mortgage Loan Statistical Information"), Credit Suisse Securities and CSFB Mortgage Securities presented tables of statistics about the mortgage loans in the collateral pool. ARMT 2007-2 Pros. Sup. III-1 to III-17. Each table focused on a certain characteristic of the loans (for example, cut-off date principal balance) and divided the loans into categories based on that characteristic (for example, loans with cut-off date principal balances of $0.01 to $25,000, $25,000.01 to $50,000, $50,000.01 to $75,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Group 2 Original LTV Ratios," divided the loans into 11 categories of LTV (for example, less than or equal to 50%, 50.01% to 55%, 55.01% to 60% etc.). For each category, the table stated the number of mortgage loans, the principal balance, and the percent of principal balance in group 2. ARMT 2007-2 Pros. Sup. III-11.

26

COMPLAINT FOR RESCISSION – Page 10

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

d.      "The minimum original LTV ratio and the maximum original LTV ratio for the mortgage loans in loan group 2 are 7.67% and 100.00%, respectively. As of the cut-off date, the weighted average original LTV ratio for the mortgage loans in loan group 2 will be approximately 78.95%." ARMT 2007-2 Pros. Sup. III-11.

29.      These statements were untrue or misleading because (i) the stated LTVs of a significant number of those mortgage loans were lower than the actual LTVs or (ii) Credit Suisse Securities and CSFB Mortgage Securities omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs of those mortgage loans based on those appraisals were lower than the true LTVs of those mortgage loans.

30.      In the prospectus supplement, Credit Suisse Securities and CSFB Mortgage Securities made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation . . . ." ARMT 2007-2 Pros. Sup. S-34.

31.      This statement was untrue or misleading because appraisals of a significant number of the properties that secured the mortgage loans did not conform to USPAP.

32.      In the prospectus supplement, Credit Suisse Securities and CSFB Mortgage Securities made the following statement about the appraisals of the properties that secured the 42.88% of the subset of loans in group 2 of the collateral pool originated or acquired by DLJ Mortgage Capital, Inc.: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation . . . ." ARMT 2007-2 Pros. Sup. S-40.

COMPLAINT FOR RESCISSION – Page 11

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

33.     This statement was untrue or misleading because appraisals of a significant number of the properties that secured the mortgage loans originated or acquired by DLJ Mortgage Capital, Inc. did not conform to USPAP.

34.     In the prospectus supplement, Credit Suisse Securities and CSFB Mortgage Securities made the following statement about the appraisals of the properties that secured the 21.62% of the subset of loans in group 2 of the collateral pool originated or acquired by Credit Suisse Financial Corp.: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation . . . ." ARMT 2007-2 Pros. Sup. S-41.

35.     This statement was untrue or misleading because appraisals of a significant number of the properties that secured the mortgage loans originated or acquired by Credit Suisse Financial Corp. did not conform to USPAP.

36.     By these untrue and misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificate issued by Adjustable Rate Mortgage Trust 2007-2 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the LTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

**a.      Upward bias in appraisals**

37.     As noted above, an accurate appraisal is essential to an accurate LTV. During the time before this securitization, however, there was widespread upward bias in appraisals of properties that secured nonconforming mortgage loans and consequent understatement of the LTVs of those loans. The main instigators of this bias were mortgage

COMPLAINT FOR RESCISSION – Page 12

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

brokers, real estate brokers, and loan officers who were not paid unless loans closed and properties changed hands, and who thus had a strong incentive to importune appraisers to appraise properties at values high enough to enable transactions to close. (Furnishing an appraisal high enough to enable a transaction to close was known as "hitting the bid." In a sale, this meant ensuring that the appraised value was equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid" meant ensuring that the appraised value was high enough to enable the proposed loan to comply with the lender's requirements for LTV.)

38.     Brokers and loan officers importuned appraisers by threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by refusing to pay for completed appraisals that did not "hit the bid."

39.     There is abundant evidence of upward bias in appraisals throughout the mortgage loan industry before the date of this securitization. Starting in 2000 and continuing until 2009, 11,000 appraisers signed a petition addressed to the Appraisal Subcommittee of the Federal Financial Institutions Examination Council, an agency of the United States Government whose "mission is to ensure that real estate appraisers, who perform appraisals in real estate transactions that could expose the United States government to financial loss, are sufficiently trained and tested to assure competency and independent judgment according to uniform high professional standards and ethics." In the petition, the 11,000 appraisers wrote:

> We, the undersigned, represent a large number of licensed and certified real estate appraisers in the United States, who seek your assistance in solving a problem facing us on a daily basis. Lenders (meaning any and all of the following: banks, savings and loans, mortgage brokers, credit unions and loan officers in general; not to

COMPLAINT FOR RESCISSION – Page 13

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

19

mention real estate agents) have individuals within their ranks, who, as a normal course of business, apply pressure on appraisers to hit or exceed a predetermined value.

    This pressure comes in many forms and includes the following:

- the withholding of business if we refuse to inflate values,

- the withholding of business if we refuse to guarantee a predetermined value,

- the withholding of business if we refuse to ignore deficiencies in the property,

- refusing to pay for an appraisal that does not give them what they want,

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

    We request that action be taken to hold the lenders responsible for this type of violation and provide for a penalty on any person or business who engages in the practice of pressuring appraisers to do dishonest appraisals that do not provide for independent judgment. We believe that this practice has adverse effects on our local and national economies and that the potential for great financial loss exists. We also believe that many individuals have been adversely affected by the purchase of homes which have been over-valued.

    40.    The first-hand statements of the 11,000 appraisers are corroborated by a nationwide survey of 1,200 appraisers during the second half of 2006, which was conducted by October Research Corporation and reviewed by the statistical consulting service of a major state university. The margin of error in the survey was plus or minus 3.2%. The respondents were asked about their experiences over as much as five years before the date of the survey. The results of the 2006 survey confirmed and elaborated on the findings of a 2003 survey which had found that 55% of appraisers felt "uncomfortable pressure to overstate property values in greater than half of their appraisals."

    41.    Specific findings of the survey included:

COMPLAINT FOR RESCISSION – Page 14

**YARMUTH WILSDON CALFO**

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

- "90% of respondent appraisers indicated that they felt pressure to restate/adjust/change property valuations."

- "71% of appraisers indicated that they felt uncomfortable pressure from mortgage brokers to overstate property valuations."

- "Real estate agents and brokers exerted similar pressure 56% of the time."

- "96% of respondents felt that appraisers in their market, when pressured to restate/adjust/change values, did modify property values."

- 75% of respondents stated that their business was negatively affected when they refused to change a valuation.

- 68% of respondents lost the client when they refused to restate/adjust/change an appraised value.

- 45% of respondents did not get paid for their appraisals when they refused to restate/adjust/change an appraised value.

42.     It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

          **b.**     **Violations of Uniform Standards of Professional Appraisal Practice**

43.     Appraisers and appraisals are governed by the Uniform Standards of Professional Appraisal Practice (USPAP), which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." USPAP includes the following provisions:

         a.     Third USPAP Ethics Conduct Rule: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

COMPLAINT FOR RESCISSION – Page 15

**YARMUTH WILSDON CALFO**

b.      Fifth USPAP Ethics Conduct Rule: "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

c.      Second USPAP Ethics Management Rule:

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.      the reporting of a predetermined result (*e.g.*, opinion of value);

2.      a direction in assignment results that favors the cause of the client;

3.      the amount of a value opinion;

4.      the attainment of a stipulated result; or

5.      the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

44.      The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 19 discusses "Unacceptable Assignment Conditions in Real Property Appraisal Assignments." As background, Advisory Opinion 19 notes that many appraisers report requests for their services accompanied by such conditions as: "Approximate (or Minimum) value needed: ____"; "If this property will not appraise for at least _____, stop and call us immediately"; etc. About such conditions, Advisory Opinion 19 states:

Certain types of conditions are unacceptable in any assignment because performing an assignment under such conditions violates USPAP. Specifically, an assignment condition is unacceptable when it:

COMPLAINT FOR RESCISSION – Page 16

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

- precludes an appraiser's impartiality. Because such a condition destroys the objectivity and independence required for the development and communication of credible results;

- limits the scope of work to such a degree that the assignment results are not credible, given the intended use of the assignment; or

- limits the content of a report in a way that results in the report being misleading.

45.     Seattle Bank repeats paragraphs 37 through 41. This evidence demonstrates pervasive violations of USPAP throughout the nonconforming mortgage loan industry before the date of this securitization.

46.     It is very probable that, because there were widespread violations of USPAP throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had appraisals conducted in violation of USPAP.

>          c.     **Evidence of untrue or misleading statements about the LTVs of the mortgage loans in the collateral pool of this securitization specifically**

47.     Since the date of this securitization, 308 of the 1,792 mortgage loans in the collateral pool have been foreclosed upon. Those 308 properties were sold for a total of approximately $81,579,233 in foreclosure. The total value ascribed to those same properties in the LTV data reported in the prospectus supplement and other documents Credit Suisse Securities and CSFB Mortgage Securities sent to Seattle Bank was $139,995,701. Thus, those properties were sold for 58.3% of the value ascribed to them, a difference of 41.7%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV data reported in the prospectus supplement and

COMPLAINT FOR RESCISSION – Page 17

other documents Credit Suisse Securities and CSFB Mortgage Securities sent to Seattle

Bank were too high, the resulting LTVs were too low, and thus that the statements in the

prospectus supplement and other documents sent to Seattle Bank about the LTVs were

untrue or misleading. The difference cannot be explained by the declines in house prices in

the areas in which those properties were located (even after taking account of the fact that

properties in foreclosure may sometimes sell for less than their fair market value). Analysis

of data in an industry-standard database of securitized mortgage loans shows that the

differences between the values ascribed to these properties and the prices at which the

properties were sold in foreclosure are significantly greater than the declines in house prices

in the same geographical areas over the same periods (that is, between the making of each

mortgage loan and the corresponding foreclosure sale).

**B.     Untrue or Misleading Statements about the Occupancy Status of the Properties
That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

       **1.      The materiality of occupancy status**

48.     Residential real estate is usually divided into primary residences, second

homes, and investment properties. Mortgages on primary residences are less risky than

mortgages on second homes and investment properties.

49.     Occupancy status (that is, whether the property that secures a mortgage is to

be the primary residence of the borrower, a second home, or an investment property) is an

important measure of the risk of a mortgage loan, and the percentage of loans in the

collateral pool of a securitization that are secured by mortgages on primary residences

rather than on second homes or investment properties is an important measure of the risk of

certificates sold in that securitization. Other things being equal, the higher the percentage of

COMPLAINT FOR RESCISSION – Page 18

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

loans secured by primary residences, the lower the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans. Differences in the percentage of the mortgage loans in the collateral pool of a securitization that are secured by mortgages on primary residences have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

### 2. Untrue or misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization

50. In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a. Approximately 75.22% of the subset of loans in group 2 were owner occupied. ARMT 2007-2 Pros. Sup. S-15.

b. In Annex III of the prospectus supplement described in paragraph 28, Credit Suisse Securities and CSFB Mortgage Securities presented a table entitled "Group 2 Occupancy Types." This table divided the subset of loans in group 2 into the categories "Primary," "Investment," and "Second Home." For each category, the table stated the number of mortgage loans, the principal balance, and the percent of principal balance in group 2. ARMT 2007-2 Pros. Sup. III-10.

c. In the "Group 2 Occupancy Types" table, Credit Suisse Securities and CSFB Mortgage Securities stated that 75.22% of the subset of loans in group 2, by

COMPLAINT FOR RESCISSION – Page 19

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

aggregate principal balance outstanding, were secured by a "Primary" residence, 18.35% were secured by an "Investment" property, and 6.43% were secured by a "Second Home." ARMT 2007-2 Pros. Sup. III-10.

51.     These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Second Home" was lower than the actual number of loans in that category; or (iv) Credit Suisse Securities and CSFB Mortgage Securities omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

52.     By these untrue and misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificate issued by Adjustable Rate Mortgage Trust 2007-2 that they offered and sold to Seattle Bank.

> **3.     Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

53.     Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not.

COMPLAINT FOR RESCISSION – Page 20

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

54.     This type of "occupancy fraud" was widespread throughout the nonconforming mortgage loan industry during the time before this securitization. BasePoint Analytics LLC, a consultant about fraud, studied millions of mortgage loans for evidence of fraud. BasePoint concluded that occupancy fraud comprised 20% of all mortgage fraud. In November 2007, Fitch conducted a detailed review of files on 45 subprime mortgage loans made in 2006 that had defaulted early in their terms. Fitch found that, in fully two-thirds of the loans, the borrowers had stated that the properties were to be owner-occupied, but in fact, they were not.

55.     It is very probable that, because there was widespread occupancy fraud throughout the nonconforming mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.      Misleading Statements about the Credit Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.      The materiality of credit scores**

56.     A credit score (also called a FICO score after Fair Isaac Corporation, which devised the score) is a measure of a person's creditworthiness. The highest score is 850, the lowest 300. The score is calculated from such factors as the length of a person's credit history, the number of times a person has been late in paying bills, the amount of credit a person has available, etc. The higher a borrower's credit score, the lower the risk that that borrower will default on payment of his or her mortgage.

COMPLAINT FOR RESCISSION – Page 21

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

57.     A borrower's credit score is an important measure of the risk of a mortgage loan to that borrower, and the credit scores of borrowers of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. A reasonable investor considers credit scores important to the decision whether to purchase a certificate in a securitization of mortgage loans. Differences in the weighted average credit scores of borrowers of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

**2.      Misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

58.     In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a.      The non-zero weighted average credit score for the subset of loans in group 2 was 705. ARMT 2007-2 Pros. Sup. S-15.

b.      In Annex III of the prospectus supplement described in paragraph 28, Credit Suisse Securities and CSFB Mortgage Securities presented a table entitled "Group 2 Credit Score Distribution." This table divided the loans into 12 categories of credit score (for example, not available, 601 to 620, 621 to 640, etc.). For each category, the table stated the number of mortgage loans, the principal balance, and the percent of principal balance in group 2. ARMT 2007-2 Pros. Sup. III-10.

COMPLAINT FOR RESCISSION – Page 22

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

28

c.      "The minimum credit score and the maximum credit score for the mortgage loans in loan group 2 (where available) are 609 and 818, respectively. As of the cut-off date, the weighted average credit score for the mortgage loans in loan group 2 (where available) will be approximately 705." ARMT 2007-2 Pros. Sup. III-10.

59.    These statements were misleading because Credit Suisse Securities and CSFB Mortgage Securities omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their credit scores.

60.    By these misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificate issued by Adjustable Rate Mortgage Trust 2007-2 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

61.    A person's credit or FICO score is an important factor in his or her eligibility for a mortgage loan. In order to make themselves eligible for loans they would not otherwise be eligible for (or for larger loans than they would otherwise be eligible for), many borrowers used a practice known as "tradeline renting." As Fair Isaac itself described this practice in testimony to Congress, "customers with good FICO scores . . . add strangers with poor FICO scores to their credit card accounts as authorized users." (The strangers do not actually have the use of the account.) By this process, a person can raise his or her credit score by as much as 75 points. By repeating the process, a person can raise his or her credit score by as much as 200 points. Tradeline renting was available from "credit repair" sites on the Internet, which charged as much as $2,000 for the service. Tradeline renting

COMPLAINT FOR RESCISSION – Page 23

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

was widespread throughout the nonconforming mortgage loan industry during the time before this securitization.

62.     In its review of subprime mortgage loans in November 2007, Fitch found that the credit scores of 16% of the borrowers that it studied reflected tradeline renting.

63.     It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their credit scores by tradeline renting.

**D.      Failure to Disclose the Substantial Deterioration of LTV and Credit Score as Predictors of the Performance of Mortgage Loans Securitized by Credit Suisse Securities or Originated by Countrywide Home Loans, Inc.**

64.     Seattle Bank repeats paragraphs 24 through 63.

65.     Investors in mortgage-backed securities, including Seattle Bank, rely extensively on certain characteristics of the mortgage loans in the collateral pool of a securitization to predict the performance of those loans and thereby to determine the risk both of those loans and of the certificates sold in that securitization. Reasonable investors consider information about these characteristics important to the decision whether to purchase a certificate in a securitization of mortgage loans. Among the most important of these characteristics are LTV and credit score.

66.     In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made statements about the LTVs and credit scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

COMPLAINT FOR RESCISSION – Page 24

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

67.    During the time before this securitization, the power of LTV and credit score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

68.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Credit Suisse Securities or its affiliates (including CSFB Mortgage Securities). The lines in Figure 1 show, for all nonconforming loans securitized by Credit Suisse Securities or its affiliates, that the weighted-average reported LTV and weighted-average reported credit score were nearly constant. Despite the stability of these important credit characteristics, however, the actual credit quality of nonconforming loans securitized by Credit Suisse Securities or its affiliates deteriorated steadily during the time before this securitization. The bars in Figure 1 show early payment defaults, that is, the percent of loans (by outstanding principal balance) that became 60 or more days delinquent within six months after they were made. An early payment default is usually the result of poor credit quality and poor underwriting of the loan when it was made, rather than of macroeconomic factors after it was made. As Figure 1 makes clear, the credit quality of the loans securitized by Credit Suisse Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and credit scores.

COMPLAINT FOR RESCISSION – Page 25

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888





69.     Figure 2 further illustrates the undisclosed deterioration in the credit quality

of nonconforming loans securitized by Credit Suisse Securities or its affiliates, which had

nearly constant weighted-average reported LTVs and credit scores. Figure 2 shows, for

each month after origination, the percentage (by outstanding principal balance) of

nonconforming mortgage loans made in each of 2004, 2005, 2006, and 2007 and securitized

by Credit Suisse Securities or its affiliates that were 60 or more days delinquent. As Figure

2 makes clear, the credit quality of the loans securitized by Credit Suisse Securities or its

affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar

reported LTVs and credit scores.

COMPLAINT FOR RESCISSION – Page 26

III
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888



Figure 2: Percent of Loans Securitized by Credit Suisse Securities or its Affiliates 60+ Delinquent in Each Month After Origination, by Year of Origination

70.     This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true not only of nonconforming mortgage loans securitized by Credit Suisse Securities and its affiliates but also of nonconforming mortgage loans originated by Countrywide Home Loans, Inc., which originated 15.86% of the subset of mortgage loans in group 2. The lines in Figure 3 show, for all nonconforming loans originated by Countrywide Home Loans, Inc., that the weighted-average reported LTV and weighted-average reported credit score were nearly constant. Despite the stability of these important credit characteristics, however, the actual credit quality of nonconforming loans originated by Countrywide Home Loans, Inc. deteriorated steadily during the time before this securitization. Like the bars in Figure 1, the bars in Figure 3 show early payment defaults. As Figure 3 makes clear, the credit quality of the loans originated by Countrywide

COMPLAINT FOR RESCISSION – Page 27

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even

2  though those loans had very similar reported LTVs and credit scores.



15  71.   Figure 4 further illustrates the undisclosed deterioration in the credit quality

16  of nonconforming loans originated by Countrywide Home Loans, Inc., which had nearly

17  constant weighted-average reported LTVs and credit scores. Figure 4 shows, for each

18  month after origination, the percentage (by outstanding principal balance) of

19  nonconforming mortgage loans originated by Countrywide Home Loans, Inc. in each of

20  2004, 2005, 2006, and 2007 that were 60 or more days delinquent. As Figure 4 makes clear,

21  the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated

22  steadily from 2004 to 2007, even though those loans had very similar reported LTVs and

23  credit scores.

COMPLAINT FOR RESCISSION – Page 28

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888



Figure 4: Percent of Loans Originated by Countrywide Home Loans, Inc.  60+ Delinquent in Each Month After Origination, by Year of Origination

72.      All statements that Credit Suisse Securities and CSFB Mortgage Securities made about the LTVs and credit scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. originated were nearly constant in weighted average LTV and weighted average credit score, yet performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

73.      By these misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificate issued by Adjustable Rate Mortgage Trust 2007-2 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 29

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**E.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

    **1.    The materiality of underwriting guidelines and the extent of compliance with them**

74.    Most or all originators of nonconforming mortgage loans had written guidelines by which they evaluated applications for loans. An originator's guidelines, and the extent to which the originator complies with them, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are a substantial part of the collateral pool. A reasonable investor considers the underwriting guidelines of each originator of a substantial part of the mortgage loans in the collateral pool of a securitization, and the extent to which the originator complied with its guidelines, important to the decision whether to purchase a certificate in that securitization. Differences in those guidelines or in the extent to which an originator complied with them have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

    **2.    Untrue or misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

75.    On pages S-33 through S-35 of the prospectus supplement, Credit Suisse Securities and CSFB Mortgage Securities made statements about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

COMPLAINT FOR RESCISSION – Page 30

76.     One of these statements was that: "In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower." ARMT 2007-2 Pros. Sup. S-33 to S-34.

77.     On information and belief, these statements were untrue or misleading because Credit Suisse Securities and CSFB Mortgage Securities omitted to state that: (a) the originators were making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) the originators were making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) the originators were failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

78.     On pages S-38 through S-40 of the prospectus supplement, Credit Suisse Securities and CSFB Mortgage Securities made statements about the underwriting guidelines of DLJ Mortgage Capital, Inc., which originated or acquired 42.88% of the group 2 mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

79.     One of these statements was that: "In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower." ARMT 2007-2 Pros. Sup. S-39.

80.     These statements were untrue or misleading because Credit Suisse Securities and CSFB Mortgage Securities omitted to state that: (a) DLJ Mortgage Capital, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) DLJ Mortgage Capital, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) DLJ

COMPLAINT FOR RESCISSION – Page 31

YARMUTH WILSLON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

Mortgage Capital, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

81.    On pages S-40 through S-41 of the prospectus supplement, Credit Suisse Securities and CSFB Mortgage Securities made statements about the underwriting guidelines of Credit Suisse Financial Corp., which originated or acquired 21.62% of the group 2 mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

82.    One of these statements was that: "In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower." ARMT 2007-2 Pros. Sup. S-40.

83.    These statements were untrue or misleading because Credit Suisse Securities and CSFB Mortgage Securities omitted to state that: (a) Credit Suisse Financial Corp. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Credit Suisse Financial Corp. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Credit Suisse Financial Corp. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

84.    By these untrue or misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificate issued by Adjustable Rate Mortgage Trust 2007-2 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 32

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**3.**     **Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

85.     During the time before this securitization, most or all originators of nonconforming mortgage loans relaxed their actual lending standards, notwithstanding their stated underwriting guidelines. Based on an empirical study of subprime loan applications, economists at the International Monetary Fund found "robust evidence that lending standards eased in the subprime mortgage industry during the fast expansion of the past few years [i.e. 2005-2007]." This general relaxation of lending standards included: (a) frequent, and increasingly frequent, exceptions to stated underwriting guidelines; (b) frequent, and increasingly frequent, exceptions to underwriting guidelines when no compensating factor was present; and (c) frequent, and increasingly frequent, failure to follow quality-assurance practices intended to detect and prevent fraud.

86.     The general relaxation of lending standards that took place before the time of this securitization in most or all originators of subprime mortgage loans took place specifically at Countrywide Home Loans, Inc., the originator of 15.86% of the subset of mortgage loans in group 2 of this securitization. A federal investigation into Countrywide's lending practices revealed that "loan documents were often marked by dubious or erroneous information." One former Countrywide manager, who pleaded guilty to two counts of wire-fraud, said that "If you had a pulse, [Countrywide] gave you a loan," and that the practice of pushing through loans with false information was common. Another account manager claimed that Countrywide was "infested" with employees who violated company standards to underwrite loans. For instance, one borrower, a personal trainer who made less than

COMPLAINT FOR RESCISSION – Page 33

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

$20,000 per year, claimed that her Countrywide loan application listed her income as more than four times that amount, and qualified her for a mortgage where the payment was $500 more than her monthly income.

**F.     Claim for Rescission**

87.     Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for this certificate, $45,000,000, plus interest of 8% per annum from May 30, 2007, to the date on which it recovers the $45,000,000, plus its costs and the reasonable fees of its attorneys in this action, minus the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

## VI. SECOND CLAIM FOR RELIEF

| | |
|---:|:---|
| *Certificates*: | Two certificates in tranche 6-A-2-1 of Adjustable Rate Mortgage Trust, Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2005-10 |
| *Dates of Purchase*: | September 30, 2005 and November 15, 2005 |
| *Consideration Paid*: | $100,000,000 and $33,384,515 |
| *Underwriter*: | Credit Suisse Securities |
| *Depositor/Issuer*: | CSFB Mortgage Securities |
| *Controlling Person of Depositor/Issuer*: | Credit Suisse Management LLC |

88.     Seattle Bank repeats paragraphs 1 through 17.

89.     Adjustable Rate Mortgage Trust, Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2005-10 was a securitization in September 2005 of approximately 3,589 mortgage loans, in six groups, with an aggregate principal balance of

COMPLAINT FOR RESCISSION – Page 34

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

40

approximately $1,315,515,626. The mortgage loans were originated or acquired by DLJ Mortgage Capital, Inc. and Washington Mutual Bank. All of the mortgage loans in group 6 (from which Seattle Bank's certificates were to be paid) were originated or acquired by DLJ Mortgage Capital, Inc. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

90.     Credit Suisse Securities and CSFB Mortgage Securities offered and sold to Seattle Bank two senior certificates in this securitization, in tranche 6-A-2-1, for which Seattle Bank paid $100,000,000 on September 30, 2005 and $33,384,515 on November 15, 2005.

91.     In connection with their offer and sale of these certificates to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[3] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents Credit Suisse Securities and CSFB Mortgage Securities made statements of material fact about the certificates that they offered and sold to Seattle Bank.

92.     Seattle Bank relied on the statements by Credit Suisse Securities and CSFB Mortgage Securities in these documents in deciding to purchase these certificates. It was reasonable for Seattle Bank to rely on the statements in these documents.

---

[3] The prospectus supplement for ARMT 2005-10 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/802106/000089109205001891/e22519_424b5.txt.

COMPLAINT FOR RESCISSION – Page 35

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

41

93.     Many of the statements of material fact that Credit Suisse Securities and CSFB Mortgage Securities made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.     Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.     The materiality of LTVs**

94.     Seattle Bank repeats paragraphs 24 through 27.

**2.     Untrue or misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the LTVs of the mortgage loans in the collateral pool of this securitization**

95.     In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

a.     The weighted average original LTV for the subset of mortgage loans in group 6 (from which Seattle Bank's certificates were to be paid) was 68.10%. ARMT 2005-10 Pros. Sup. S-18.

b     "All of the initial mortgage loans as of the Cut-off Date had LTV ratios at origination of 100% or less." ARMT 2005-10 Pros. Sup. S-34.

c.     In Annex III of the prospectus supplement ("Mortgage Loan Statistical Information"), Credit Suisse Securities and CSFB Mortgage Securities presented tables of statistics about the mortgage loans in the collateral pool. ARMT 2005-10 Pros. Sup. III-1 to III-47. Each table focused on a certain characteristic of the loans (for example, principal balance at the cut-off date) and divided the loans into categories based on that characteristic (for example, loans with principal balances at the cut-off date of $0.01 to

COMPLAINT FOR RESCISSION – Page 36

$25,000, $25,000.01 to $50,000, $75,000.01 to $100,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Group 6 Original LTV Ratios," divided the loans into 10 categories of LTV (for example, less than or equal to 50%, 50.01% to 55%, 55.01% to 60%, etc.). For each category, the table stated the number of mortgage loans, the principal balance, and the percent of principal balance in group 6. ARMT 2005-10 Pros. Sup. III-43.

d.      "The minimum original LTV ratio and the maximum original LTV ratio for the mortgage loans in loan group 6 are 8.04% and 95.00%, respectively. As of the cut-off date, the weighted average original LTV ratio for the mortgage loans in loan group 6 will be approximately 68.10%." ARMT 2005-10 Pros. Sup. III-43.

96.      These statements were untrue or misleading because (i) the stated LTVs of a significant number of those mortgage loans were lower than the actual LTVs or (ii) Credit Suisse Securities and CSFB Mortgage Securities omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.

97.      In the prospectus supplement, Credit Suisse Securities and CSFB Mortgage Securities made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation . . . ." ARMT 2005-10 Pros. Sup. S-40.

COMPLAINT FOR RESCISSION – Page 37

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

43

98.    This statement was untrue or misleading because appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool did not conform to USPAP.

99.    By these untrue and misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificates issued by Adjustable Rate Mortgage Trust 2005-10 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the LTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

**a.    Upward bias in appraisals**

100.    Seattle Bank repeats paragraphs 37 through 41.

101.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

**b.    Violations of Uniform Standards of Professional Appraisal Practice**

102.    Seattle Bank repeats paragraphs 43 through 45.

103.    It is very probable that, because there were widespread violations of USPAP throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had appraisals conducted in violation of USPAP.

COMPLAINT FOR RESCISSION – Page 38

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1

2

        c.     **Evidence of untrue or misleading statements about the LTVs of the mortgage loans in the collateral pool of this securitization specifically**

3

4

5

      104.    Since the date of this securitization, 281 of the 3,589 mortgage loans in the collateral pool have been foreclosed upon. Those 281 properties were sold for a total of approximately $73,876,781 in foreclosure. The total value ascribed to those same properties

6

7

in the LTV data reported in the prospectus supplement and other documents Credit Suisse Securities and CSFB Mortgage Securities sent to Seattle Bank was $109,859,600. Thus,

8

9

those properties were sold for 67.3% of the value ascribed to them, a difference of 32.7%.

10

This large difference is evidence that the values ascribed to those properties, and to all

11

properties in the collateral pool, in the LTV data reported in the prospectus supplement and

12

other documents Credit Suisse Securities and CSFB Mortgage Securities sent to Seattle

13

Bank were too high, the resulting LTVs were too low, and thus that the statements in the

14

prospectus supplement and other documents sent to Seattle Bank about the LTVs were

15

untrue or misleading. The difference cannot be explained by the declines in house prices in

16

the areas in which those properties were located (even after taking account of the fact that

17

properties in foreclosure may sometimes sell for less than their fair market value). Analysis

18

of data in an industry-standard database of securitized mortgage loans shows that the

19

differences between the values ascribed to these properties and the prices at which the

20

properties were sold in foreclosure are significantly greater than the declines in house prices

21

22

in the same geographical areas over the same periods (that is, between the making of each

23

mortgage loan and the corresponding foreclosure sale).

24

25

26

COMPLAINT FOR RESCISSION – Page 39

**YARMUTH WILSON CALFO**

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

45

**B.    Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

      **1.    The materiality of occupancy status**

      105.    Seattle Bank repeats paragraphs 48 through 49.

      **2.    Untrue or misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

      106.    In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

      a.    Approximately 81.02% of the subset of loans in group 6 were secured by primary residences. ARMT 2005-10 Pros. Sup. S-18.

      b.    In Annex III of the prospectus supplement described in paragraph 95, Credit Suisse Securities and CSFB Mortgage Securities presented a table entitled "Group 6 Occupancy Types." This table divided the loans in the subset of loans in Group 6 into the categories "Primary," "Investment," and "Second Home." For each category, the table stated the number of mortgage loans, the principal balance, and the percent of principal balance in group 6. ARMT 2005-10 Pros. Sup. III-42.

      c.    In the "Group 6 Occupancy Types" table, Credit Suisse Securities and CSFB Mortgage Securities stated that 81.02% of the subset of loans in group 6, by aggregate principal balance outstanding, were secured by a "Primary" residence, 11.15% were secured by an "Investment" property, and 7.84% were secured by a "Second Home." ARMT 2005-10 Pros. Sup. III-42.

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

107.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Second Home" was lower than the actual number of loans in that category; or (iv) Credit Suisse Securities and CSFB Mortgage Securities omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

108.    By these untrue and misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificates issued by Adjustable Rate Mortgage Trust 2005-10 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

109.    Seattle Bank repeats paragraphs 53 through 54.

110.    It is very probable that, because there was widespread occupancy fraud throughout the nonconforming mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.    Misleading Statements about the Credit Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.    The materiality of credit scores**

111.    Seattle Bank repeats paragraphs 56 through 57.

COMPLAINT FOR RESCISSION – Page 41

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

47

**2.      Misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

112.     In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a.      The weighted average credit score for the subset of loans in group 6 was 734. ARMT 2005-10 Pros. Sup. S-18.

b.      In Annex III of the prospectus supplement described in paragraph 95, Credit Suisse Securities and CSFB Mortgage Securities presented a table entitled "Group 6 Credit Score Distribution." This table divided the subset of loans in group 6 into nine categories of credit score (for example, 641 to 660, 661 to 680, 681 to 700, etc.). For each category, the table stated the number of mortgage loans, the principal balance, and the percent of principal balance in group 6. ARMT 2005-10 Pros. Sup. III-43.

c.      "The minimum credit score and the maximum credit score for the mortgage loans in loan group 6 are 653 and 816, respectively. As of the cut-off date, the weighted average credit score for the mortgage loans in loan group 6 will be approximately 734." ARMT 2005-10 Pros. Sup. III-43.

113.     These statements were misleading because Credit Suisse Securities and CSFB Mortgage Securities omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their credit scores.

COMPLAINT FOR RESCISSION – Page 42

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

114.    By these misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificates issued by Adjustable Rate Mortgage Trust 2005-10 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

115.    Seattle Bank repeats paragraphs 61 through 62.

116.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their credit scores by tradeline renting.

**D.    Failure to Disclose the Substantial Deterioration of LTV and Credit Score as Predictors of the Performance of Mortgage Loans Securitized by Credit Suisse Securities**

117.    Seattle Bank repeats paragraphs 94 through 116.

118.    Seattle Bank repeats paragraph 65.

119.    In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made statements about the LTVs and credit scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

120.    During the time before this securitization, the power of LTV and credit score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse

COMPLAINT FOR RESCISSION – Page 43

YARMUTH WILSDON CALFO

1  if the loans were made in 2005 than if they were made in 2004, worse if made in 2004 than
2  if made in 2003, etc.
3          121.    This deterioration in the credit quality of mortgage loans with ostensibly
4  similar credit characteristics was true in particular of nonconforming loans securitized by
5  Credit Suisse Securities or its affiliates (including CSFB Mortgage Securities). As Figure 1
6  in paragraph 68 makes clear, the credit quality of the loans securitized by Credit Suisse
7  Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007,
8  even though those loans had very similar reported LTVs and credit scores. As Figure 2 in
9  paragraph 69 makes clear, the credit quality of the loans securitized by Credit Suisse
10 Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans
11 had very similar reported LTVs and credit scores.
12
13         122.    All statements that Credit Suisse Securities and CSFB Mortgage Securities
14 made about the LTVs and credit scores of the mortgage loans in the collateral pool of this
15 securitization were misleading because those defendants omitted to state that, in the time
16 before this securitization, loans that Credit Suisse Securities securitized were nearly
17 constant in weighted average LTV and weighted average credit score, yet performed worse
18 if the loans were made in 2005 than if they were made in 2004, worse if made in 2004 than
19 if made in 2003, etc.
20
21         123.    By these misleading statements, Credit Suisse Securities and CSFB
22 Mortgage Securities materially understated the risk of the certificates issued by Adjustable
23 Rate Mortgage Trust 2005-10 that they offered and sold to Seattle Bank.
24
25
26

COMPLAINT FOR RESCISSION – Page 44

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**E.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of underwriting guidelines and the extent of compliance with them**

124.    Seattle Bank repeats paragraph 74.

**2.    Untrue or misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

125.    On pages S-39 through S-40 of the prospectus supplement, Credit Suisse Securities and CSFB Mortgage Securities made statements about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

126.    One of these statements was that: "In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower." ARMT 2005-10 Pros. Sup. S-39.

127.    On information and belief, these statements were untrue or misleading because Credit Suisse Securities and CSFB Mortgage Securities omitted to state that: (a) the originators were making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) the originators were making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) the originators were failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

COMPLAINT FOR RESCISSION – Page 45

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

128.     By these untrue or misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificates issued by Adjustable Rate Mortgage Trust 2005-10 that they offered and sold to Seattle Bank.

**3.     Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

129.     Seattle Bank repeats paragraph 85.

**F.     Claim for Rescission**

130.     Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for the certificate it purchased on September 30, 2005, $100,000,000, plus interest of 8% per annum from September 30, 2005, to the date on which it recovers the $100,000,000, plus its costs and the reasonable fees of its attorneys in this action, minus the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

131.     Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is also entitled to recover the consideration that it paid for the certificate it purchased on November 15, 2005, $33,384,515, plus interest of 8% per annum from November 15, 2005, to the date on which it recovers the $33,384,515, plus its costs and the reasonable fees of its attorneys in this action, minus the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

COMPLAINT FOR RESCISSION – Page 46

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

## VII. THIRD CLAIM FOR RELIEF

| | |
|---:|:---|
| *Certificate*: | One certificate in tranche 1-A-3-1 of Adjustable Rate Mortgage Trust, Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2005-6A |
| *Date of Purchase*: | July 29, 2005 |
| *Consideration Paid:* | $70,300,000 |
| *Underwriter*: | Credit Suisse Securities |
| *Depositor/Issuer*: | CSFB Mortgage Securities |
| *Controlling Person of Depositor/Issuer*: | Credit Suisse Management LLC |

132.    Seattle Bank repeats paragraphs 1 through 17.

133.    Adjustable Rate Mortgage Trust, Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2005-6A was a securitization in July 2005 of approximately 1,423 mortgage loans, in two groups, with an aggregate principal balance of approximately $464,845,563. The loans were originated or acquired by DLJ Mortgage Capital, Inc. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

134.    Credit Suisse Securities and CSFB Mortgage Securities offered and sold to Seattle Bank a senior certificate in this securitization, in tranche 1-A-3-1, for which Seattle Bank paid $70,300,000 on July 29, 2005.

135.    In connection with their offer and sale of this certificate to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[4] drafts of some of the statistical tables to be

---

[4] The prospectus supplement for ARMT 2005-6A was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/802106/000089109205001454/e22236_424b5.txt.

COMPLAINT FOR RESCISSION – Page 47

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents Credit Suisse Securities and CSFB Mortgage Securities made statements of material fact about the certificate that they offered and sold to Seattle Bank.

136.    Seattle Bank relied on the statements by Credit Suisse Securities and CSFB Mortgage Securities in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

137.    Many of the statements of material fact that Credit Suisse Securities and CSFB Mortgage Securities made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**G.    Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of LTVs**

138.    Seattle Bank repeats paragraphs 24 through 27.

**2.    Untrue or misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the LTVs of the mortgage loans in the collateral pool of this securitization**

139.    In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

a.    The weighted average original loan-to-value ratio for the subset of mortgage loans in group 1 (from which Seattle Bank's certificate was to be paid) is 73.87%. ARMT 2005-6A Pros. Sup. S-14.

COMPLAINT FOR RESCISSION – Page 48

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

b.      "All of the mortgage loans as of the Cut-off Date had LTV ratios at origination of 100% or less." ARMT 2005-6A Pros. Sup. S-30.

c.      In Annex III of the prospectus supplement ("Mortgage Loan Statistical Information"), Credit Suisse Securities and CSFB Mortgage Securities presented tables of statistics about the mortgage loans in the collateral pool. ARMT 2005-6A Pros. Sup. III-1 to III-14. Each table focused on a certain characteristic of the loans (for example, principal balance at the cut-off date) and divided the loans into categories based on that characteristic (for example, loans with principal balances at the cut-off date of $0.01 to $25,000, $25,000.01 to $50,000, $50,000.01 to $75,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Group 1 Original LTV Ratios," divided the subset of loans in Group 1 into 10 categories of LTV (for example, less than or equal to 50%, 50.01% to 55%, 55.01% to 60% etc.). For each category, the table stated the number of mortgage loans, the principal balance, and the percent of principal balance in group 1. ARMT 2005-6A Pros. Sup. III-3.

d.      "The minimum original LTV ratio and the maximum original LTV ratio for the mortgage loans in loan group 1 are 5.51% and 95.00%, respectively. As of the cut-off date, the weighted average original LTV ratio for the mortgage loans in loan group 1 will be approximately 73.87%." ARMT 2005-6A Pros. Sup. III-3.

140.    These statements were untrue or misleading because (i) the stated LTVs of a significant number of those mortgage loans were lower than the actual LTVs or (ii) Credit Suisse Securities and CSFB Mortgage Securities omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool

COMPLAINT FOR RESCISSION – Page 49

were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.

141.    In the prospectus supplement, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the appraisals of the properties that secured the mortgage loans in the collateral pool: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation . . . ." ARMT 2005-6A Pros. Sup. S-34.

142.    These statements were untrue or misleading because appraisals of a significant number of the properties that secured the mortgage loans did not conform to USPAP.

143.    By these untrue and misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificate issued by Adjustable Rate Mortgage Trust 2005-6A that they offered and sold to Seattle Bank.

**3.     Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the LTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

**a.      Upward bias in appraisals**

144.    Seattle Bank repeats paragraphs 37 through 41.

145.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

COMPLAINT FOR RESCISSION – Page 50

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

b. **Violations of Uniform Standards of Professional Appraisal Practice**

146.   Seattle Bank repeats paragraphs 43 through 45.

147.   It is very probable that, because there were widespread violations of USPAP throughout the mortgage loan industry during the time before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had appraisals conducted in violation of USPAP.

c. **Evidence of untrue or misleading statements about the LTVs of the mortgage loans in the collateral pool of this securitization specifically**

148.   Since the date of this securitization, 59 of the 1,423 mortgage loans in the collateral pool have been foreclosed upon. Those 59 properties were sold for a total of approximately $20,227,208 in foreclosure. The total value ascribed to those same properties in the LTV data reported in the prospectus supplement and other documents Credit Suisse Securities and CSFB Mortgage Securities sent to Seattle Bank was $29,397,858. Thus, those properties were sold for 68.8% of the value ascribed to them, a difference of 31.2%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV data reported in the prospectus supplement and other documents Credit Suisse Securities and CSFB Mortgage Securities sent to Seattle Bank were too high, the resulting LTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis

COMPLAINT FOR RESCISSION – Page 51

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

**H.     Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

**1.     The materiality of occupancy status**

149.    Seattle Bank repeats paragraphs 48 through 49.

**2.     Untrue or misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

150.    In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.      Approximately 76.52% of the subset of loans in group 1 were secured by primary residences. ARMT 2005-6A Pros. Sup. S-14.

b.      In Annex III of the prospectus supplement described in paragraph 139, Credit Suisse Securities and CSFB Mortgage Securities presented a table entitled "Group 1 Occupancy Types." This table divided the subset of loans in group 1 into the categories "Primary," "Investment," and "Second Home." For each category, the table stated the number of mortgage loans, the principal balance, and the percent of principal balance in group 1. ARMT 2005-6A Pros. Sup. III-3.

COMPLAINT FOR RESCISSION – Page 52

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

c.      In the "Group 1 Occupancy Types" table, Credit Suisse Securities and CSFB Mortgage Securities stated that 76.52% of the subset of loans in group 1, by aggregate principal balance outstanding, were secured by a "Primary" residence, 16.39% were secured by an "Investment" property, and 7.09% were secured by a "Second Home." ARMT 2005-6A Pros. Sup. III-3.

151.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Second Home" was lower than the actual number of loans in that category; or (iv) Credit Suisse Securities and CSFB Mortgage Securities omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

152.    By these untrue and misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificate issued by Adjustable Rate Mortgage Trust 2005-6A that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

153.    Seattle Bank repeats paragraphs 53 through 54.

154.    It is very probable that, because there was widespread occupancy fraud throughout the mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this

COMPLAINT FOR RESCISSION – Page 53

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**I.    Misleading Statements about the Credit Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

   **1.    The materiality of credit scores**

   155.    Seattle Bank repeats paragraphs 56 through 57.

   **2.    Misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

   156.    In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made the following statements about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

      a.    The weighted average credit score the subset of loans in group 1 was 734. ARMT 2005-6A Pros. Sup. S-14.

      b.    In Annex III of the prospectus supplement described in paragraph 139, Credit Suisse Securities and CSFB Mortgage Securities presented a table entitled "Group 1 Credit Score Distribution." This table divided the loans into 10 categories of credit score (for example, 621 to 640, 641 to 660, 661 to 680 etc.). For each category, the table stated the number of mortgage loans, the principal balance, and the percent of principal balance in group 1. ARMT 2005-6A Pros. Sup. III-3.

      c.    "The minimum credit score and the maximum credit score for the mortgage loans in loan group 1 are 634 and 819 respectively. As of the cut-off date, the

COMPLAINT FOR RESCISSION – Page 54

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

weighted average credit score for the mortgage loans in loan group 1 will be approximately 734." ARMT 2005-6A Pros. Sup. III-3.

157.     These statements were misleading because Credit Suisse Securities and CSFB Mortgage Securities omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their credit scores.

158.     By these misleading statements, Credit Suisse Securities and CSFB Mortgage Securities materially understated the risk of the certificate issued by Adjustable Rate Mortgage Trust 2005-6A that they offered and sold to Seattle Bank.

**3.     Basis of the allegations above that these statements by Credit Suisse Securities and CSFB Mortgage Securities about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

159.     Seattle Bank repeats paragraphs 61 through 62.

160.     It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their credit scores by tradeline renting.

**J.     Failure to Disclose the Substantial Deterioration of LTV and Credit Score as Predictors of the Performance of Mortgage Loans Securitized by Credit Suisse Securities**

161.     Seattle Bank repeats paragraphs 138 through 160.

162.     Seattle Bank repeats paragraph 65.

163.     In the prospectus supplement and other documents they sent to Seattle Bank, Credit Suisse Securities and CSFB Mortgage Securities made statements about the LTVs

COMPLAINT FOR RESCISSION – Page 55

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

and credit scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

164.    During the time before this securitization, the power of LTV and credit score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2005 than if they were made in 2004, worse if made in 2004 than if made in 2003, etc.

165.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Credit Suisse Securities or its affiliates (including CSFB Mortgage Securities). As Figure 1 in paragraph 68 makes clear, the credit quality of the loans securitized by Credit Suisse Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and credit scores. As Figure 2 in paragraph 69 makes clear, the credit quality of the loans securitized by Credit Suisse Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and credit scores.

166.    All statements that Credit Suisse Securities and CSFB Mortgage Securities made about the LTVs and credit scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that Credit Suisse Securities securitized were nearly constant in weighted average LTV and weighted average credit score, yet performed worse

COMPLAINT FOR RESCISSION – Page 56

YARMUTH WILSDON CALFO

1  if the loans were made in 2005 than if they were made in 2004, worse if made in 2004 than

2  if made in 2003, etc.

3      167.    By these misleading statements, Credit Suisse Securities and CSFB

4  Mortgage Securities materially understated the risk of the certificate issued by Adjustable

5  Rate Mortgage Trust 2005-6A that they offered and sold to Seattle Bank.

7  **K.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originator of the Mortgage Loans in the Collateral Pool of this Securitization**

9      **1.    The materiality of underwriting guidelines and the extent of compliance with them**

10      168.    Seattle Bank repeats paragraph 74.

12      **2.    Untrue or misleading statements by Credit Suisse Securities and CSFB Mortgage Securities about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

14      169.    On pages S-33 through S-34 of the prospectus supplement, Credit Suisse

16  Securities and CSFB Mortgage Securities made statements about the underwriting

17  guidelines of the originators of the mortgage loans in the collateral pool of this

18  securitization. All of those statements are incorporated here by reference.

19      170.    One of these statements was that: "In addition, certain exceptions to the

20  underwriting standards described herein are made in the event that compensating factors are

21  demonstrated by a prospective borrower." ARMT 2005-6A Pros. Sup. S-33.

23      171.    On information and belief, these statements were untrue or misleading

24  because Credit Suisse Securities and CSFB Mortgage Securities omitted to state that: (a)

25  The originators were making frequent, and increasingly frequent, exceptions to those

26  underwriting guidelines; (b) the originators were making frequent, and increasingly

COMPLAINT FOR RESCISSION – Page 57

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1   frequent, exceptions to those underwriting guidelines when no compensating factor was

2   present; and (c) the originators were failing frequently, and increasingly frequently, to

3   follow quality-assurance practices intended to detect and prevent fraud.

4       172.   By these untrue or misleading statements, Credit Suisse Securities and CSFB

5   Mortgage Securities materially understated the risk of the certificate issued by Adjustable

6   Rate Mortgage Trust 2005-6A that they offered and sold to Seattle Bank.

7

8       **3.    Basis of the allegations above that these statements by Credit Suisse
           Securities and CSFB Mortgage Securities about the underwriting
           guidelines of the originator of the mortgage loans in the collateral pool
           of this securitization, and about the extent of their compliance with
           those guidelines, were untrue or misleading**

9       173.   Seattle Bank repeats paragraph 85.

10  **L.    Claim for Rescission**

11      174.   Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover

12  the consideration that it paid for this certificate, $70,300,000, plus interest of 8% per annum

13  from July 29, 2005, to the date on which it recovers the $70,300,000, plus its costs and the

14  reasonable fees of its attorneys in this action, minus the amount of income it has received

15  on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate

16  before entry of judgment.

COMPLAINT FOR RESCISSION – Page 58

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

## VIII. PRAYER FOR RELIEF

WHEREFORE, Seattle Bank respectfully demands payment of the amount it paid to purchase each certificate, together with interest on that amount at the rate of 8% per annum from the date on which Seattle Bank purchased each certificate until the date on which it receives payment, and its costs and attorneys' fees in this action, all as provided by RCW 21.20.430(1).

## JURY DEMAND

SEATTLE BANK DEMANDS TRIAL BY SIX PERSON JURY OF ALL ISSUES SO TRIABLE.

Dated: December 23, 2009

YARMUTH WILSDON CALFO PLLC

By: _____
Richard C. Yarmuth, WSBA #4990
Matthew Carvalho, WSBA #31201

818 Stewart Street
Seattle, Washington 98101
(206) 516-3800
(206) 516-3888 (fax)

GRAIS & ELLSWORTH LLP
70 East 55th Street
New York, New York 10022
(212) 755-0100
(212) 755-0052 (fax)

COMPLAINT FOR RESCISSION – Page 59

900.01 jl233501 12/23/09

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1
2
3
4
5
6
7
8
9

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

10  FEDERAL HOME LOAN BANK OF
    SEATTLE, a bank created by federal law,          No. 09-2-46353-1

11            Plaintiff,                             SUMMONS [60 DAYS]

12        v.

13  CREDIT SUISSE SECURITIES (USA) LLC
    f/k/a CREDIT SUISSE FIRST BOSTON LLC,
14  a Delaware limited liability company; CREDIT
    SUISSE FIRST BOSTON MORTGAGE
15  SECURITIES CORP., a Delaware corporation;
    and CREDIT SUISSE MANAGEMENT LLC
16  f/k/a CREDIT SUISSE FIRST BOSTON
    MANAGEMENT LLC, a Delaware limited
17  liability company,

18            DefendantS.

19
20
21  **TO THE DEFENDANTS:** A lawsuit has been started against you in the above entitled

22  court by FEDERAL HOME LOAN BANK OF SEATTLE. Plaintiff's claim is stated in the

23  written complaint, a copy of which is served upon you with this summons.

24      In order to defend against this lawsuit, you must respond to the complaint by stating

    your defense in writing, and by serving a copy upon the person signing this summons
25
    within 60 days after the service of this summons, excluding the day of service, or a default
26
    judgment may be entered against you without notice. A default judgment is one where

SUMMONS [60 DAYS] – Page 1

ıḷ¦
YARMUTH WILSON CALFO

818 STEWART STREET. SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1   plaintiff is entitled to what he asks for because you have not responded.  If you serve a

2   notice of appearance on the undersigned person, you are entitled to notice before a default

3   judgment may be entered.

4       You may demand that the plaintiff file this lawsuit with the court.  If you do so, the

5   demand must be in writing and must be served upon the person signing this summons.

6   Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the

7   court, or the service on you of this summons and complaint will be void.

8       If you wish to seek the advice of an attorney in this matter, you should do so

9   promptly so that your written response, if any, may be served on time.

10       This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the

11   State of Washington and Revised Code of Washington 4.28.180.

12       DATED:  December 23, 2009.

13

14                        YARMUTH WILSDON CALFO PLLC

15                        By: _____

16                        Richard C. Yarmuth, WSBA #4990
                     Matthew W. Carvalho, WSBA #31201

17                        818 Stewart Street, Suite 1400
                     Seattle, WA  98101

18                        Telephone:  206.516.3800

19

20                        GRAIS & ELLSWORTH LLP
                     70 East 55th Street

21                        New York, New York 10022
                     (212) 755-0100

22                        (212) 755-0052 (fax)

23

24

25

26

600.01 JI213507 12/23/09
SUMMONS [60 DAYS] – Page 2

ili
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

# EXHIBIT B

FILED

09 DEC 23 PM 2:53

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46353-1 SEA

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
# IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| Federal Home Loan Bank of Seattle | NO.  09-2-46353-1      SEA |
| | Order Setting Civil Case Schedule (*ORSCS) |
| Plaintiff(s) | |
| vs | |
| Credit Suisse Securities USA LLC, et al. | ASSIGNED JUDGE  Heavey                20 |
| | FILE DATE:                      12/23/2009 |
| Defendant(s) | **TRIAL DATE:**                **06/13/2011** |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

## I. NOTICES

**NOTICE TO PLAINTIFF:** The Plaintiff may serve a copy of this **Order Setting Case Schedule** (*Schedule*) on the Defendant(s) along with the *Summons and Complaint/Petition*. Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the *Summons and Complaint/Petition* or (2) service of the Defendant's first response to the *Complaint/Petition*, whether that response is a *Notice of Appearance*, a response, or a Civil Rule 12 (CR 12) motion. The *Schedule* may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

*"I understand that I am required to give a copy of these documents to all parties in this case."*

| | |
|---|---|
| Print Name | Sign Name |

Order Setting Civil Case Schedule (*ORSCS)                    REV. 12/08    1

**I. NOTICES (continued)**

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLR*] --
especially those referred to in this **Schedule**. In order to comply with the **Schedule**, it will be necessary for
attorneys and parties to pursue their cases vigorously from the day the case is filed. For example,
discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties,
claims, and defenses, for disclosing possible witnesses [*See KCLR 26*], and for meeting the discovery
cutoff date [*See KCLR 37(g)*].

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD PARTY COMPLAINTS:**
A filing fee of **$200** must be paid when any answer that includes additional claims is filed in an existing
case.

**KCLR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the
deadline in the schedule.  The court will review the confirmation of joinder document to determine if a
hearing is required.  If a Show Cause order is issued, all parties cited in the order must appear before
their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of <u>all parties and claims</u> is filed with the Superior
Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this
*Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the
parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any
pending motions by notifying the bailiff to the assigned judge.

Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a
*Notice of Settlement* pursuant to KCLR 41, and forwarding a courtesy copy to the assigned judge. If a
final decree, judgment or order of dismissal of <u>all parties and claims</u> is not filed by 45 days after a *Notice
of Settlement*, the case may be dismissed with notice.

**If you miss your scheduled Trial Date**, the Superior Court Clerk is authorized by KCLR 41(b)(2)(A) to
present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of
Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office,
parties must provide the assigned judge with a courtesy copy.

**ARBITRATION FILING <u>AND</u> TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to
mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and
cross-claims have been filed.  If mandatory arbitration is required after the deadline, parties must obtain
an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must
pay a $220 arbitration fee**. If a party seeks a trial de novo when an arbitration award is appealed, a fee of
$250 and the request for trial de novo must be filed with the Clerk's Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
**All** parties will be assessed a fee authorized by King County Code 4.71.050 whenever the Superior Court
Clerk must send notice of non-compliance of schedule requirements <u>and/or</u> Local Civil Rule 41.

**King County Local Rules are available for viewing at www.kingcounty.gov/courts/clerk.**

## II. CASE SCHEDULE

| CASE EVENT | DEADLINE or EVENT DATE | Filing Needed |
|---|---|---|
| Case Filed and Schedule Issued. | Wed 12/23/2009 | * |
| Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [*See KCLMAR 2.1(a) and Notices on Page 2*]. **$220 arbitration fee must be paid** | Wed 06/02/2010 | * |
| **DEADLINE** to file Confirmation of Joinder if not subject to Arbitration. [*See KCLCR 4.2(a) and Notices on Page 2*]. | Wed 06/02/2010 | * |
| **DEADLINE** for Hearing Motions to Change Case Assignment Area. [See *KCLCR 82(e)*] | Wed 06/16/2010 | |
| **DEADLINE** for Disclosure of Possible Primary Witnesses [*See KCLCR 26(b)*]. | Mon 01/10/2011 | |
| **DEADLINE** for Disclosure of Possible Additional Witnesses [*See KCLCR 26(b)*]. | Tue 02/22/2011 | |
| **DEADLINE** for Jury Demand [*See KCLCR 38(b)(2)*]. | Mon 03/07/2011 | * |
| **DEADLINE** for Setting Motion for a Change in Trial Date [*See KCLCR 40(d)(2)*] | Mon 03/07/2011 | * |
| **DEADLINE** for Discovery Cutoff [*See KCLCR 37(g)*]. | Mon 04/25/2011 | |
| **DEADLINE** for Engaging in Alternative Dispute Resolution [*See KCLCR 16(b)*]. | Mon 05/16/2011 | |
| **DEADLINE** for Exchange Witness & Exhibit Lists & Documentary Exhibits [*See KCLCR 4(j)*]. | Mon 05/23/2011 | |
| **DEADLINE** to file Joint Confirmation of Trial Readiness [*See KCLCR 16(a)(2)*] | Mon 05/23/2011 | * |
| **DEADLINE** for Hearing Dispositive Pretrial Motions [*See KCLCR 56; CR 56*]. | Tue 05/31/2011 | |
| Joint Statement of Evidence [*See KCLCR (4)(k)*]. | Mon 06/06/2011 | * |
| **DEADLINE** for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file Proposed Findings of Fact and Conclusions of Law with the Clerk) | Mon 06/06/2011 | * |
| Trial Date [*See KCLCR 40*]. | Mon 06/13/2011 | |

### III. ORDER

Pursuant to King County Local Civil Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above. Penalties, including but not limited to sanctions set forth in Local Civil Rule 4(g) and Rule 37 of the Superior Court Civil Rules, may be imposed for non-compliance. It is FURTHER ORDERED that the party filing this action **must** serve this *Order Setting Civil Case Schedule* and attachment on all other parties.

**DATED:**   12/23/2009

**PRESIDING JUDGE**

Order Setting Civil Case Schedule (*ORSCS)

REV. 12/08   3

## IV. ORDER ON CIVIL PROCEEDINGS FOR ASSIGNMENT TO JUDGE

**READ THIS ORDER BEFORE CONTACTING YOUR ASSIGNED JUDGE**
This case is assigned to the Superior Court Judge whose name appears in the caption of this case schedule.  The assigned Superior Court Judge will preside over and manage this case for all pretrial matters.

**COMPLEX LITIGATION:**  If you anticipate an unusually complex or lengthy trial, please notify the assigned court as soon as possible.

**APPLICABLE RULES:**  Except as specifically modified below, all the provisions of King County Local Civil Rules 4 through 26 shall apply to the processing of civil cases before Superior Court Judges.  The local civil rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx .

**CASE SCHEDULE AND REQUIREMENTS**
Deadlines are set by the case schedule, issued pursuant to Local Civil Rule 4.

**THE PARTIES ARE RESPONSIBLE FOR KNOWING AND COMPLYING WITH ALL DEADLINES IMPOSED BY THE COURT'S LOCAL CIVIL RULES.**

**A. Joint Confirmation regarding Trial Readiness Report:**
No later than twenty one (21) days before the trial date, parties shall complete and file (with a copy to the assigned judge) a joint confirmation report setting forth whether a jury demand has been filed, the expected duration of the trial, whether a settlement conference has been held, and special problems and needs (e.g. interpreters, equipment, etc.).

The form is available at http://www.kingcounty.gov/courts/superiorcourt.aspx .  If parties wish to request a CR 16 conference, they must contact the assigned court.  Plaintiff's/petitioner's counsel is responsible for contacting the other parties regarding said report.

**B. Settlement/Mediation/ADR**
a. Forty five (45) days before the trial date, counsel for plaintiff/petitioner shall submit a written settlement demand.  Ten (10) days after receiving plaintiff's/petitioner's written demand, counsel for defendant/respondent shall respond (with a counter offer, if appropriate).

b. Twenty eight (28) days before the trial date, a Settlement/Mediation/ADR conference shall have been held.  FAILURE TO COMPLY WITH THIS SETTLEMENT CONFERENCE REQUIREMENT MAY RESULT IN SANCTIONS.

**C. Trial:**  Trial is scheduled for 9:00 a.m. on the date on the case schedule or as soon thereafter as convened by the court.  The Friday before trial, the parties should access the King County Superior Cour website http://www.kingcounty.gov/courts/superiorcourt.aspx  to confirm trial judge assignment. Information can also be obtained by calling (206) 205-5984.

## MOTIONS PROCEDURES

### A. Noting of Motions

**Dispositive Motions:**  All summary judgment or other dispositive motions will be heard with oral argument before the assigned judge.  The moving party must arrange with the hearing judge a date and time for the hearing, consistent with the court rules.  Local Civil Rule 7 and Local Civil Rule 56 govern procedures for summary judgment or other motions that dispose of the case in whole or in part.  The local civil rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx.

**Nondispositive Motions:**  These motions, which include discovery motions, will be ruled on by the assigned judge without oral argument, unless otherwise ordered.  All such motions must be noted for a date by which the ruling is requested; this date must likewise conform to the applicable notice requirements.  Rather than noting a time of day, the Note for Motion should state "Without Oral Argument."  Local Civil Rule 7 governs these motions, which include discovery motions.  The local civil rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx.

**Motions in Family Law Cases not involving children:** Discovery motions to compel, motions in limine, motions relating to trial dates and motions to vacate judgments/dismissals shall be brought before the assigned judge.  All other motions should be noted and heard on the Family Law Motions calendar.  Local Civil Rule 7 and King County Family Law Local Rules govern these procedures.  The local rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx.

**Emergency Motions:**   Under the court's local civil rules, emergency motions will be allowed only upon entry of an Order Shortening Time.  However, emergency discovery disputes may be addressed by telephone call and without written motion, if the judge approves.

## B. Original Documents/Working Copies/ Filing of Documents

**All original documents must be filed with the Clerk's Office.**  Please see information on the Clerk's Office website at www.kingcounty.gov/courts/clerk regarding the new requirement outlined in LGR 30 that attorneys must e-file documents in King County Superior Court.  The exceptions to the e-filing requirement are also available on the Clerk's Office website.

The working copies of all documents in support or opposition must be marked on the upper right corner of the first page with the date of consideration or hearing and the name of the assigned judge.  The assigned judge's working copies must be delivered to his/her courtroom or the Judges' mailroom.  Working copies of motions to be heard on the Family Law Motions Calendar should be filed with the Family Law Motions Coordinator.  On June 1, 2009 you will be able to submit working copies through the Clerk's office E-Filing application at www.kingcounty.gov/courts/clerk.

**Service of documents.** E-filed documents may be electronically served on parties who opt in to E-Service within the E-Filing application.  The filer must still serve any others who are entitled to service but who have not opted in.  E-Service generates a record of service document that can be e-filed.  Please see information on the Clerk's office website at www.kingcounty.gov/courts/clerk regarding E-Service.

**Original Proposed Order:** Each of the parties must include an original proposed order granting requested relief with the working copy materials submitted on any motion.  Do not file the original of the proposed order with the Clerk of the Court.   Should any party desire a copy of the order as signed and filed by the judge, a pre-addressed, stamped envelope shall accompany the proposed order.

**Presentation of Orders:** All orders, agreed or otherwise, must be presented to the assigned judge.  If that judge is absent, contact the assigned court for further instructions.  If another judge enters an order on the case, counsel is responsible for providing the assigned judge with a copy.

73

**Proposed orders finalizing settlement and/or dismissal by agreement of all parties shall be presented to the assigned judge or in the Ex Parte Department.**  Formal proof in Family Law cases must be scheduled before the assigned judge by contacting the bailiff, or formal proof may be entered in the Ex Parte Department.  **If final order and/or formal proof are entered in the Ex Parte Department, counsel is responsible for providing the assigned judge with a copy.**

*C.*   *Form*

Memoranda/briefs for matters heard by the assigned judge may not exceed twenty four (24) pages for dispositive motions and twelve (12) pages for nondispositive motions, unless the assigned judge permits over-length memoranda/briefs in advance of filing.  Over-length memoranda/briefs and motions supported by such memoranda/briefs may be stricken.

***IT IS SO ORDERED.  FAILURE TO COMPLY WITH THE PROVISIONS OF THIS ORDER MAY RESULT IN DISMISSAL OR OTHER SANCTIONS.  PLAINTIFF/PEITITONER SHALL FORWARD A COPY OF THIS ORDER AS SOON AS PRACTICABLE TO ANY PARTY WHO HAS NOT RECEIVED THIS ORDER.***

_____

**PRESIDING JUDGE**

74

King County
Department of Judicial Administration
Superior Court Clerk's Office

<u>**IMPORTANT NOTICE**</u>

**KING COUNTY SUPERIOR COURT HEARING LOCATIONS WILL CHANGE**

**IF THE MALENG REGIONAL JUSTICE CENTER IN KENT IS EVACUATED**

Potential serious flooding of the Green River Valley is a possibility this year based on issues with the Howard Hanson Dam.  The US Army Corps of Engineers is making the necessary repairs to the dam; however until the work is completed, the Maleng Regional Justice Center in Kent will be on an evacuation alert status.

The Clerk's Office and Superior Court remains committed to providing good customer service throughout the flood evacuation period.  If it becomes necessary to evacuate the Maleng Regional Justice Center and relocate the courtrooms, location changes to scheduled court proceedings at the King County Courthouse in Seattle may also occur.

**If you have a court proceeding scheduled either at the King County Courthouse in Seattle or at the Maleng Regional Justice Center in Kent, please call (206) 296-9300 to find out if there is a change to the location of your court proceeding.  Call within 2 days of your scheduled court date for the latest information.**

Updated information will also be posted here:

King County Superior Court's website:  http://www.kingcounty.gov/courts/superiorcourt

King County Clerk's Office website: http://www.kingcounty.gov/courts/Clerk

We thank you for your patience during this time.

75

SUPERIOR COURT OF WASHINGTON
COUNTY OF KING

| | |
|---|---|
| Federal Home Loan Bank of Seattle | NO. 09-2-46353-1 SEA |
| VS | |
| Credit Suisse Securities USA LLC, et al. | CASE INFORMATION COVER SHEET AND AREA DESIGNATION |

CAUSE OF ACTION

**(COL) -**      CONTRACT/COMMERCIAL

AREA DESIGNATION

**SEATTLE -**   Defined as all King County north of Interstate 90 and including all of Interstate 90 right of way, all of the cities of Seattle, Mercer Island, Issaquah, and North Bend, and all of Vashon and Maury Islands.

# EXHIBIT C

FILED

10 JAN 12 PM 2:14

Hon. Michael Heavey
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46353-1 SEA

1
2
3
4
5
6
7
8

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

9

10  FEDERAL HOME LOAN BANK OF
    SEATTLE, a bank created by federal law,

11          Plaintiff,

12      v.

13  CREDIT SUISSE SECURITIES (USA) LLC
    f/k/a CREDIT SUISSE FIRST BOSTON LLC,
14  a Delaware limited liability company; CREDIT
    SUISSE FIRST BOSTON MORTGAGE
15  SECURITIES CORP., a Delaware corporation;
    and CREDIT SUISSE MANAGEMENT LLC
16  f/k/a CREDIT SUISSE FIRST BOSTON
    MANAGEMENT LLC, a Delaware limited
17  liability company,

18          DefendantS.

No. 09-2-46353-1 SEA

AFFIDAVIT OF SERVICE OF
SUMMONS AND COMPLAINT RE
CREDIT SUISSE SECURITIES (USA)
LLC

19
20
21
22
23
24
25
26

AFFIDAVIT OF SERVICE OF SUMMONS AND
COMPLAINT RE CREDIT SUISSE SECURITIES (USA)
LLC – Page 1

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

## AFFIDAVIT OF SERVICE

**State of Washington**                    **County of King**                    **Superior Court**

Case Number: 09-2-46353-1 SEA

Plaintiff:
**Federal Home Loan Bank of Seattle**
vs.
Defendant:
**Credit Suisse Securities (USA) LLC, f/k/a Credit Suisse First Boston LLC, et al.**

**State of New York, County of Albany)ss.:**

Received by Target Research LLC to be served on **Credit Suisse Securities (USA) LLC, C/O Corporation Service Company, 80 State St., Albany, NY 12207.**

I, J.R. O'Rourke, being duly sworn, depose and say that on the **29th day of December, 2009** at **12:35 pm,** I:

Served the within named **CORPORATION** by delivering a true copy of the **Case Information Cover Sheet and Area Designation, Summons, Complaint and Order Setting Civil Case Schedule (ORSCS)** to Steve Pastore as Service Of Process Clerk of Corporation Service Company as **Registered Agent** of the within named corporation, in compliance with state statutes.

**Description** of Person Served: Age: 49, Sex: M, Race/Skin Color: White, Height: 5'10", Weight: 180, Hair: Brown, Glasses: Y

I certify that I am over the age of 18, have no interest in the above action, and am a Process Server in good standing in the jurisdiction in which the process was served.

Subscribed and Sworn to before me on the 7th day of
January, 2010 by the affiant who is personally known
to me.

J.R. O'Rourke
Process Server

NOTARY PUBLIC    PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified in Albany County
My Commission Expires February 28, _____

**Target Research LLC
20 Vesey Street
Ph
New York, NY 10007
(212) 227-9600
Our Job Serial Number: 2009004454**

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x

FILED

10 JAN 12 PM 2:14

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46353-1 SEA

Hon. Michael Heavey

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SEATTLE, a bank created by federal law,<br><br>        Plaintiff,<br><br>        v.<br><br>CREDIT SUISSE SECURITIES (USA) LLC f/k/a CREDIT SUISSE FIRST BOSTON LLC, a Delaware limited liability company; CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., a Delaware corporation; and CREDIT SUISSE MANAGEMENT LLC f/k/a CREDIT SUISSE FIRST BOSTON MANAGEMENT LLC, a Delaware limited liability company,<br><br>        DefendantS. | No. 09-2-46353-1 SEA<br><br>AFFIDAVIT OF SERVICE OF SUMMONS AND COMPLAINT RE CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. |

AFFIDAVIT OF SERVICE OF SUMMONS AND
COMPLAINT RE CREDIT SUISSE FIRST BOSTON
MORTGAGE SECURITIES CORP. – Page 1

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

# AFFIDAVIT OF SERVICE

**State of Washington** **County of King** **Superior Court**

Case Number: 09-2-46353-1 SEA

Plaintiff:
**Federal Home Loan Bank of Seattle**

vs.

Defendant:
**Credit Suisse Securities (USA) LLC, f/k/a Credit Suisse First Boston LLC, et al.**

**State of New York, County of Albany)ss.:**

Received by Target Research LLC to be served on **Credit Suisse First Boston Mortgage Securities Corp., C/O The Prentice-Hall Corporation System, 80 State St., Albany, NY 12207**.

I, J.R. O'Rourke, being duly sworn, depose and say that on the **29th day of December, 2009** at **12:35 pm, I:**

Served the within named **CORPORATION** by delivering a true copy of the **Case Information Cover Sheet and Area Designation, Summons, Complaint and Order Setting Civil Case Schedule (ORSCS)** to Steve Pastore as Service Of Process Clerk of The Prentice-Hall Corporation System as **Registered Agent** of the within named corporation, in compliance with state statutes.

**Description** of Person Served: Age: 49, Sex: M, Race/Skin Color: White, Height: 5'10", Weight: 180, Hair: Brown, Glasses: Y

I certify that I am over the age of 18, have no interest in the above action, and am a Process Server in good standing in the jurisdiction in which the process was served.

Subscribed and Sworn to before me on the 7th day of January, 2010 by the affiant who is personally known to me.

NOTARY PUBLIC

PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified in Albany County
My Commission Expires February 28, 2010

J.R. O'Rourke
Process Server

**Target Research LLC**
**20 Vesey Street**
**Ph**
**New York, NY 10007**
**(212) 227-9600**
Our Job Serial Number: 2009004456

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x

FILED

10 JAN 12 PM 2:14

Hon. Michael Heavey
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46353-1 SEA

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SEATTLE, a bank created by federal law, | No. 09-2-46353-1 SEA |
| Plaintiff, | AFFIDAVIT OF SERVICE OF SUMMONS AND COMPLAINT RE CREDIT SUISSE MANAGEMENT LLC |
| v. | |
| CREDIT SUISSE SECURITIES (USA) LLC f/k/a CREDIT SUISSE FIRST BOSTON LLC, a Delaware limited liability company; CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., a Delaware corporation; and CREDIT SUISSE MANAGEMENT LLC f/k/a CREDIT SUISSE FIRST BOSTON MANAGEMENT LLC, a Delaware limited liability company, | |
| DefendantS. | |

AFFIDAVIT OF SERVICE OF SUMMONS AND
COMPLAINT RE CREDIT SUISSE MANAGEMENT
LLC – Page 1

**ılı**
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

# AFFIDAVIT OF SERVICE

| | | |
|---|---|---|
| **State of Washington** | **County of King** | **Superior Court** |

Case Number: 09-2-46353-1 SEA

Plaintiff:
**Federal Home Loan Bank of Seattle**
vs.
Defendant:
**Credit Suisse Securities (USA) LLC, f/k/a Credit Suisse First Boston LLC, et al.**

**State of New York, County of Albany)ss.:**

Received by Target Research LLC to be served on **Credit Suisse Management LLC, C/O Corporation Service Company, 80 State St., Albany, NY 12207**.

I, J.R. O'Rourke, being duly sworn, depose and say that on the **29th day of December, 2009** at **12:35 pm, I:**

Served the within named **CORPORATION** by delivering a true copy of the **Case Information Cover Sheet and Area Designation, Summons, Complaint and Order Setting Civil Case Schedule (ORSCS)** to Steve Pastore as Service Of Process Clerk of Corporation Service Company as **Registered Agent** of the within named corporation, in compliance with state statutes.

**Description** of Person Served:  Age: 49,  Sex: M,  Race/Skin Color: White,  Height: 5'10",  Weight: 180,  Hair: Brown,  Glasses: Y

I certify that I am over the age of 18, have no interest in the above action, and am a Process Server in good standing in the jurisdiction in which the process was served.

Subscribed and Sworn to before me on the 7th day of January, 2010 by the affiant who is personally known to me.

_____
NOTARY PUBLIC

PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified in Albany County
My Commission Expires February 28, _____

_____
J.R. O'Rourke
Process Server

**Target Research LLC
20 Vesey Street
Ph
New York, NY  10007
(212) 227-9600**
Our Job Serial Number: 2009004453

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x